AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
for the
District of New Mexico

FILED
United States District Court
Albuquerque, New Mexico
Mitchell R. Elfers
Clerk of Court

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )     Case No.   24-MR-1128
 )
Subject Premises 1, 2 and 4, which are further described )
in Attachments A-1, A-2, and A-4 attached hereto and )
incorporated herein )

**APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS**

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, which is attached hereto and incorporated herein.

located in the _____ District of   New Mexico   , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, which is attached hereto and incorporated herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 922(g)(1); 924(c), and 21 U.S.C. §§ 841(a)(1); 846 | FIP; Possessing a Firearm in Furtherance of Drug Trafficking Crime; Possession with Intent to Distribute a Controlled Substance; Conspiracy to Distribute a Controlled Substance |

The application is based on these facts:

See attached affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of ___ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Jennifer Lopez, FBI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
  electronically signed and telephonically sworn   *(specify reliable electronic means)*.

Date:   June 12, 2024
*Judge's signature*

City and state:   Albuquerque, New Mexico            Kirtan Khalsa, US Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Jennifer Lopez, being duly sworn, do hereby depose and state as follow:

## INTRODUCTION AND PURPOSE OF THE AFFIDAVIT

1. I, Jennifer Lopez, Special Agent of the Federal Bureau of Investigation (FBI), being first duly sworn, make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search:

    a. The residence known to be accessed by GUAJIRA MAYA LOVATO a.k.a. "MAMA G," (hereinafter "LOVATO") identified as room 1 at the French Quarters Motel, located at 9317 Central Ave NW Albuquerque, New Mexico 87121 (hereinafter "Subject Premises 1");

    b. The residence known to also be accessed by LOVATO located in room 110 at 1520 Candelaria Rd NE (Days Inn) Albuquerque, New Mexico 87107 (hereinafter "Subject Premises 2").

    c. The residence known to be accessed by DOMINIC ROMERO a.k.a. "DOM," (hereinafter ROMERO) located in Room 3 at the French Quarters Motel, located at 9317 Central Ave NW Albuquerque, New Mexico 87121 (hereinafter "Subject Premises 4"); and

2. The three Subject Premises to be searched have been described in Attachments A-1, A-2, and A-4, which has been attached hereto and incorporated herein by reference. The particular evidence, fruits, and instrumentalities to be seized by agents are set forth in Attachment B, which has been attached hereto and incorporated herein.

3. This affidavit does not set forth all of my knowledge or summarize all of the investigative efforts in this matter; however, the affidavit sets forth only the facts that support probable cause to search the Subject Premises as relevant background information. All figures, times, and calculations set forth herein are approximate. Any observations referenced herein that I did not personally witness were relayed to me in oral or written reports by law enforcement officers who assisted in the investigation of LOVATO and ROMERO.

## PURPOSE OF THE AFFIDAVIT

4. The FBI's Violent Gang Task Force (VGTF) has recently learned that LOVATO is staying at Subject Premises 1 and 2, and ROMERO is staying at Subject Premises 4 where they are trafficking controlled substances from.

5. Based on the facts and information contained herein, I believe the Subject Premises contains evidence, fruits, and instrumentalities of violations of:

   a. 18 U.S.C. § 922(g)(1): Felon in Possession of a Firearm;

   b. 18 U.S.C. § 924(c): Possessing a Firearm in Furtherance of Drug Trafficking Crime;

   c. 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute a Controlled Substance; and

   d. 21 U.S.C. § 846: Conspiracy to Distribute a Controlled Substance (hereinafter the "Target Offenses").

## AFFIANT'S RELEVANT TRAINING AND EXPERIENCE

6. I am employed as a Special Agent with the Federal Bureau of Investigation (FBI) and have been a law enforcement officer for more than 4 years. I am assigned to the FBI Albuquerque Field Office, VGTF, where I primarily investigate violent street gangs, violent repeat offenders and criminal enterprises engaged in violations of the Controlled Substances Act, firearms violations, murder, racketeering and other violations of Federal law. My investigative training and experience include, but is not limited to, interviewing subjects, targets, and witnesses, writing affidavits for and executing search and arrest warrants, collecting evidence, conducting surveillance, and analyzing public records. I was a police officer before joining the FBI.

7. Over the course of my career, I have arrested numerous persons for offenses relating to drug possession and distribution, driving while intoxicated and or driving under the influence (DWI/DUI), firearm violations, assaults and other criminal conduct.

8. Through my training and experience, I am familiar with the methods and means used by individuals, drug trafficking organizations ("DTO"s), and gang/criminal enterprises to purchase, transport, store, and distribute controlled substances and firearms. I am also familiar with how those individuals and

organizations hide the substantial profits generated from their criminal activities. I have learned that these individuals often keep firearms in close proximity to themselves, and their product and proceeds, to protect them from other drug traffickers and law enforcement.

9. I know that firearms are tools of the trade and instrumentalities of the crime of drug trafficking, particularly in instances involving subjects who have committed prior violent crimes and/or firearms violations. It has been my experience that criminals who illegally possess firearms often do not part with such firearms, as it may be difficult for criminals to acquire them. I know that gang members often possess firearms on or near their person, in their vehicles and residences. I know that individuals who are prohibited from possessing firearms know they are not allowed to possess those firearms, therefore they will secrete those firearms within their vehicles, outbuildings, or residences. I know that individuals who are trafficking drugs, keep them inside their vehicles, as well as, having built in secret compartments where they are able to hide them from plain view.

10. Based on my experience, I am aware gang/criminal enterprises and DTOs utilize cellular telephones to exchange information, photographs, and felonious communications, to include the names and locations of informants, witnesses, and victims. I have also observed gang members discuss the acquisition and distribution of controlled substances and firearms to and from other members, as well as discussions about gang related assaults.

11. Based on my experience, I am aware gang/criminal enterprises obtain large amounts of US Currency in a short duration of time without having a legal means of income. I am also aware gang/criminal enterprises utilize financial drug gains/profits to purchase expensive jewelry, vehicles and other tangible items for personal satisfaction.

12. I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners, facial recognition features and iris recognition features. Some devices offer a combination of

these biometric features, and the user of such devices can select which features they would like to utilize.

13. In my training and experience, individuals involved in gang/criminal enterprises and DTOs work hard not to get caught, including continually assessing who they think is cooperating with law enforcement and how to protect themselves from those people. These individuals seek out information tending to expose government informants and share that information with other members of the organization for the common good of the enterprise. I know that gang/criminal enterprises and members of DTOs strive to have a reputation of retaliation against informants or intimidation against government officials. I have learned that individuals involved in gang/criminal enterprises and DTOs often utilize their cell phones to communicate with others regarding suspected informants or government officials. I have also learned that gang/criminal enterprises and members of DTOs will research government officials in an attempt to ascertain their identity and the locations of their residences, in that they may search for this information on the cellular devices.

14. Based upon my training, experience, and participation in the instant investigation, as well as the investigation of other gang/criminal enterprises and DTOs, I am aware of the following information.

   a. Individuals engaged in the type of criminal conduct constituting the Target Offenses maintain documents, letters and records relating to their illegal activities for long periods of time. This documentary evidence is usually secreted in their place of residence, or the residences of family members, friends, or associates, in their business locations, or in stash houses. This documentary evidence includes telephone numbers, address books, travel receipts, notes referencing aliases or coded names, false identification, money order receipts, money orders, money remittance receipts, pre-paid money cards such as, MoneyPak, Wal-Mart, Green Dot, or other debit cards, bulk U.S currency, money collection logs, such as "tally" sheets, drug load sheets, shipping/mailing receipts, detention facility inmate number lists or addresses for inmates or detention facilities.

   b. I know that members and associates of gang/criminal enterprises and DTOs have access to numerous cellular phones, often at the same time, in an effort to avoid law enforcement

monitoring. I have observed gang members, who are involved in drug trafficking, routinely use pre-paid phones requiring no subscriber information, or fictitious subscriber names, to advance their unlawful activities. These cellular telephones often contain names and phone numbers of other co-conspirators, text messages utilized to further their illicit activities, photographs and videos of gang members, controlled substances, drug proceeds, or firearms. Members of gang/criminal enterprises and DTOs often use the same strategy to mask their ownership of vehicles, real property, and utility services, in an effort to avoid detection by law enforcement.

c. In addition, I am also familiar with the use of text messaging, instant messaging, social media, and other messaging applications, used by gang/criminal enterprises and DTOs to advance their unlawful activities.

15. I have learned individuals involved in gang/criminal enterprises and DTOs possess items of identification, including but not limited to, driver's licenses, rent receipts, bills, and address books. These items may be relevant to the identity of those involved in the criminal enterprise, the possessor of the items seized, and occupants of the premises searched.

## ELECTRONIC MEDIA AND FORENSIC ANALYSIS

16. As described above and in Attachment B, this application seeks permission to search for evidence and records that might be found on the Subjects persons and at the Subject Premises, in whatever form they are found. Much of the evidence and records described in the paragraphs above, and in Attachment B, can also be produced and/or stored on electronic media. For this reason, I submit that if a computer, digital medium, or storage medium is found on the Subject Premises, there is probable cause to believe those records will be stored on that computer, digital medium, or storage medium. Thus, the warrant applied for would authorize the seizure of electronic media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

17. *Necessity of seizing or copying entire electronic media.* In most cases, a thorough search of a premises for information that might be stored on electronic media often requires the seizure of the

physical electronic media and later off-site review consistent with the warrant. In lieu of removing electronic media from the premises, it is sometimes possible to make an image copy of electronic media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the electronic media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. Electronic media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Subject Premises. However, taking the electronic media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of electronic media formats that may require off-site reviewing with specialized forensic tools.

18. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying electronic media that

reasonably appear to contain some or all of the evidence described in the warrant and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the computer or entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

19. The warrant I am applying for would permit law enforcement to obtain from certain individuals the display of physical biometric characteristics (such as fingerprint, thumbprint, or facial characteristics) in order to unlock devices subject to search and seizure pursuant to this warrant. I seek this authority based on the following:

   a. I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

   b. If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

   c. If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition

feature called "Face ID." During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes, and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

d. In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

e. As discussed in this affidavit, based on my training and experience I believe that one or more digital devices will be found during the search. The passcode or password that would unlock the device(s) subject to search under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

f. I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 4 hours *and* the passcode or

password has not been entered in the last 156 hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

g. In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose physical characteristics are among those that will unlock the device via biometric features, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it will likely be necessary for law enforcement to have the ability to require any individual, who is found at the Subject Premises and reasonably believed by law enforcement to be a user of the device, to unlock the device using biometric features in the same manner as discussed above.

h. Due to the foregoing, if law enforcement personnel encounter a device that is subject to search and seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to (1) press or swipe the fingers (including thumbs) of any individual, who is found at the Subject Premises and reasonably believed by law enforcement to be a user of the device, to the fingerprint scanner of the device; (2) hold the device in front of the face of those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

**CONFIDENTIAL HUMAN SOURCES**

20. During the course of this investigation, FBI case agents utilized two Confidential Human Sources (hereinafter "CHS" for both singular and plural) to infiltrate and report on the activities of the Target Subjects. In the paragraph that follows, I have provided an overview of each CHS, to include their basis of knowledge concerning the criminal conduct; motivation to assist the FBI; criminal history; any compensation received from the government; and a statement concerning their reliability. I have tried to provide sufficient information to the Court, while balancing the anonymity and safety of the source.

21. **CHS-1** was an associate and member of an Albuquerque Gang and has personal knowledge about LOVATO and subject premises. The FBI CHS-1 is an experienced drug dealer who has been involved in the Albuquerque drug trade and they have been associated with gang members for several years. The CHS-1 has testified in federal court in a racketeering murder trial; information provided by the CHS-1 has been utilized in more than a dozen search warrants which resulted in the seizure of a considerable amount of controlled substances, firearms, and the arrest of at multiple subjects. CHS-1 has known LOVATO since April of 2024 and is familiar with LOVATO and her illegal activities. CHS-1 has been in contact with LOVATO via telephone. CHS-1 stated he has known ROMERO almost his entire life and that they went to Elementary School together. CHS-1 has been in contact with ROMERO via telephone. CHS-1 has been in contact with LOVATO and ROMERO by telephone within the last month. CHS-1 is motivated to assist the FBI in hope to reduce violent crime and fentanyl in Albuquerque and motivated by monetary compensation. CHS-1 is not currently facing criminal charges and has eight (8) felony convictions for conspiracy, receiving or transferring stolen property, unlawful taking of a vehicle, possession of a controlled substance, possess deadly weapon by a prisoner, robbery, and intentional arson. CHS-1 has received approximately $600 of financial assistance from the FBI. Information provided by the CHS-1 has proven to be reliable in the past and I have not been given reason to doubt the integrity of the information provided by the CHS-1.

22. **CHS-2** has no felony convictions and is motivated to help a family member receive a positive recommendation in a pending criminal matter. CHS-2 grew up in and around Albuquerque gangs. CHS-2 is an experienced drug trafficker and is associated with LOVATO. CHS-2 has known LOVATO for

approximately 4 years. CHS-2 has not received any financial assistance from the FBI. Information provided by the CHS-2 has proven to be reliable in the past and I have not been given reason to doubt the integrity of the information provided by the CHS-2.

## THE SUBJECTS

23. GUAJIRA MAYA LOVATO, aka: "MAMA G": I have reviewed LOVATO's criminal history and I am aware that she has been arrested at least seven times in New Mexico and currently has an active federal probation violation warrant.

24. According to the New Mexico Secure online court records, LOVATO has been convicted of the following felony offenses:

   a. Possession of Controlled Substance on January 07, 2007, in the Bernalillo County District Court, Case No: D-202-CR-200704602, and

   b. Trafficking Controlled Substance (Poss w/ Int to Distr) on February 09, 2007, in the Bernalillo County District Court, Case No: Case #: D-202-CR-20070867.

   c. Violation of 21 U.S.C 841(a)(1) and (b)(1)(B) Distribution of 50 grams and more of a mixture and substance containing a detectable amount of methamphetamine, Case No: 1:16-CR-03206-MCA

25. DOMINIC ROMERO, aka: "DOM": I have reviewed ROMERO's criminal history and I am aware that he has 11 prior arrests in New Mexico for various offenses. Upon reviewing the online New Mexico secure court case information, ROMERO has been convicted of the felony offenses of Theft of Identity, Forgery x2, and Fraud on December 15, 2010, in the Bernalillo County District Court, Case No. D-202-CR-2010-01006.

## THE CURRENT INVESTIGATION

### SUBJECT PREMISES 1 and 2

26. In May 2024, CHS-1 informed FBI agents that LOVATO was planning to travel to Arizona and pick up big loads of drugs and firearms. LOVATO would be given a load to sell throughout the Albuquerque area. CHS-1 advised LOVATO does not live at a permanent address and goes from hotel to

hotel selling and distributing narcotics and firearms.

27. Within the last five weeks, CHS-1 informed FBI agents a shipment came in from Arizona with a lot of fentanyl, methamphetamines, and marijuana. CHS-1 advised LOVATO was temporarily staying at Hotel 505 located at 900 Medical Arts Ave NE, Albuquerque, NM 87102 distributing and selling narcotics and firearms. CHS-1 advised agents that LOVATO relocated from Hotel 505 because she knew she had a federal warrant and was on the run.

28. Within the last month, CHS-1 conducted a controlled purchase of methamphetamine and cocaine from LOVATO at 1520 Candelaria Rd NE Albuquerque, NM 87107 Room 301. The VGTF observed LOVATO standing on the balcony of the third-floor smoking prior to the buy. During the controlled by, CHS-1 contacted LOVATO by telephone and confirmed he was able to purchase drugs from LOVATO. CHS-1 provided LOVATO an amount of official Bureau funds in exchange for an amount of methamphetamine and cocaine from LOVATO at room 301. The CHS-1 was searched before and after the controlled buy, no contraband was located. Also, CHS-1 was provided a video and audio recording device, which agents monitored. During the controlled buy, Agents observed LOVATO provide an amount of methamphetamine and cocaine to CHS-1. VGTF Agents later field tested the evidence, which yielded a presumptive positive result for the presence of methamphetamine and cocaine and entered the items in FBI evidence. CHS-1 stated sometime after the controlled buy, LOVATO moved out of Room 301.

29. CHS-2 also stated LOVATO was going from hotel to hotel distributing and selling narcotics. CHS-2 stated LOVATO was going between Subject Premises 1 and Subject Premises 2. CHS-2 stated LOVATO was making suicidal statements and had a firearm with her inside of her room.

30. Within the last week, CHS-1 advised LOVATO relocated and is staying at Subject Premises 2 (Room 110 at 1520 Candelaria Rd NE). CHS-1 stated LOVATO was hopping from Subject Premises 1 and Subject Premises 2. CHS-1 stated LOVATO has people staying at Subject Premises 4 who is also distributing and selling drugs. CHS-1 advised ROMERO stayed in Subject Premises 4 and helped aid LOVATO in distributing and selling of drugs. CHS-1 showed VGTF Agents images of firearms (3 handguns and 3 long guns) located in Subject Premises 2 that CHS-1 photographed within the last week. CHS-1 advised everybody associated with LOVATO is expected to be armed.

31. Within the past 48 hours, the CHS-1 stated LOVATO relocated to Subject Premises 2 however, continued to store guns and drugs at Subject Premises 1. CHS-1 advised LOVATO continued to go from Subject Premises 1 and Subject Premises 2 distributing and selling drugs out of Subject Premises 1 and Subject Premises 2.

## SUBJECT PREMISES 4

32. Within the past few days, the Albuquerque FBI Violent Gang Task Force (VGTF) conducted a controlled buy with CHS-1 from Romero at Subject Premises 4. CHS-1 contacted ROMERO by telephone and confirmed purchase of drugs. CHS-1 utilized more than $500 in official Bureau funds for more than 200 Fentanyl pills and more than 10g of Methamphetamines from ROMERO, who CHS-1 advised stayed in Subject Premises 4. CHS-1 was searched before and after the controlled buy for contraband and was provided a recording device. Later, Agents found the recording device malfunctioned. VGTF Agents later field tested the evidence, which yielded a presumptive positive result for the presence of methamphetamine and entered the items in FBI evidence. After the controlled buy, the VGTF stayed on surveillance and witnessed a male come out of Subject Premises 4 and conduct what appeared to be a hand-to-hand drug transaction activity consistent with drug trafficking. CHS-1 advised VGTF agents they observed a rifle and pistol inside Subject Premises 4 during the controlled buy.

33. Within the last week and on several different occasions, the last surveillance being within 48 hours, VGTF conducted surveillance and observed a high level of foot traffic in and out of the hotel consistent with drug trafficking behavior at Subject Premises 4 where CHS-1 advised ROMERO was staying.

## THE SUBJECT PREMISES

34. <u>Subject Premises 1</u> is located at 9317 Central Ave NW Albuquerque, NM 87121, and may be described as a single-story motel, white in color with red trim and pillars, and a sign reading "French Quarter Motel" in the front off of Central Ave NW. The number 1 is posted on the door of Subject Premises 1, Room 1. Subject Premises 1, room 1, is the first room located closest to Central Ave. Color photographs

of Subject Premises with the number one is contained within Attachment A-1.

35. <u>Indicia of Residence:</u>

   a. CHS-1 advised VGTF agents that LOVATO goes from hotel to hotel selling drugs.

   b. CHS-1 and CHS-2 stated LOVATO relocated to Subject Premises 1. LOVATO is now selling drugs from Subject Premises 1.

   c. CHS-1 and CHS-2 advised VGTF agents that LOVATO was trafficking narcotics from Subject Premises 1.

   d. According to CHS-1, within the last 48 hours, has since relocated however, still used Subject Premises 1 to store drugs, guns and other personal belongings.

   e. Within the last 48 hours, VGTF surveillance observed a male drop off a bag and bin to Subject Premises 1.

36. <u>Subject Premises 2</u> is located at 1520 Candelaria Rd NE, Albuquerque, NM 87107 Room 110, and may be described as a three-story hotel, beige in color with blue and yellow painted trim throughout the hotel and a sign reading "Days Inn" in the North siding of the building. The numbers 110 are posted next to the door. Color photographs of Subject Premises is contained in Attachment A-2.

37. <u>Indicia of Residence:</u>

   a. CHS-1 advised VGTF agents that LOVATO goes from hotel to hotel selling drugs.

   b. CHS-1 stated LOVATO relocated to Subject Premises 2. LOVATO is now selling drugs from Subject Premises 2.

   c. CHS-1 and CHS-2 advised VGTF agents that LOVATO was trafficking narcotics from Subject Premises 2.

   d. Within the last 24 hours, CHS-1 advised agents that they had observed LOVATO inside Subject Premises 2.

38. <u>Subject Premises 4</u> is located at 9317 Central Ave NW Albuquerque, NM 87121, Room 3, and may be described as a single-story motel, white in color with red trim and pillars, and a sign reading "French Quarter Motel" in the front off Central Ave NW. The number 3 is posted on the door of Subject

Premises 4, room 3. Subject Premises 4, Room 3, is located next to two rooms from Subject Premises 1. Color photographs of Subject Premises 4 with the number two is contained within Attachment A-4.

39. <u>Indicia of Residence:</u>

    a. CHS-1 advised VGTF agents that ROMERO was trafficking narcotics from Subject Premises 4.

    b. CHS-1 stated ROMERO is a convicted felon and has a firearm with him at all times. Upon Agents reviewing the online New Mexico secure court case information, ROMERO has been convicted of the felony offenses of Theft of Identity, Forgery x2, and Fraud on December 15, 2010, in the Bernalillo County District Court, Case No. D-202-CR-2010-01006.

    c. Within the last week, VGTF surveillance units observed drug trafficking behavior at Subject Premises 4 where CHS-1 advised ROMERO was staying. VGTF surveillance observed more than two vehicles make short duration stops and observed a high level of foot traffic in and out of Subject Premises 4.

    d. CHS-1 conducted a controlled buy from ROMERO in Subject Premises 4. CHS-1 purchased more than $500 in official Bureau Funds for more than 200 Fentanyl pills and more than 10g of Methamphetamines.

## CONCLUSION

40. Based on the information contained herein, I submit there is probable cause for a search warrant of the Subject Premises described in Attachment A to seek the items described in Attachment B for evidence pertaining to violations of the Target Offenses. This affidavit was reviewed by Assistant United States Attorney Paul Mysliwiec.

                                Respectfully submitted,

                                */s/ Jennifer Lopez*
                                _____

                                Jennifer Lopez
                                FBI Special Agent

Subscribed electronically and sworn telephonically on June 12, 2024.

_Kirtan Khalsa_____

HONORABLE KIRTAN KHALSA
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF NEW MEXICO

## ATTACHMENT A-4

### Subject Premises

<u>Premises to be searched:</u> Subject Premises 4 is located at 9317 Central Ave NW Albuquerque, NM 87121, Room3, and may be described as a single-story motel, white in color with red trim and pillars, and a sign reading "French Quarter Motel" in the front off Central Ave NW. The number 3 is posted on the door of Subject Premises 4. ~~Subject Premises 4, Room 3, is located next to Subject Premises 4~~. Color photographs of Subject Premises 4 are contained below.





Google Streetview photograph of the French Quarter Motel



Surveillance photograph of Subject Premises 4

The search of Subject Premises 4 shall include the entire residence (Room 3) only and all outbuildings, trash cans, and storage containers designated for use by the Subject Premises 4. The search shall also include vehicles parked at, or in front of, the Subject Premises 4 provided such vehicle has an apparent connection to the Subject Premises 4. Connection to the Subject Premises 4 may be established by way of prior law enforcement observation, vehicle registration, subject admission or possession of an ignition key.

<u>Biometric Access to Devices</u>: During the execution of the search of the premises described herein, law enforcement officers are also specifically authorized to compel any individual, who is found at the Subject Premises and reasonably believed by law enforcement to be a user of the device, to provide biometric features, including pressing fingers (including thumbs) against and/or putting a face before the sensor, or any other security feature requiring biometric recognition, of:

1. Any cellular devices found at the premises, and

2. Where the devices are limited to those which are capable of containing and reasonably could contain fruits, evidence, information, contraband, or instrumentalities of the offense(s) as described in the search warrant affidavit and warrant attachments for the purpose of attempting to unlock the devices' security features in order to search the contents as authorized by this warrant.

3. This warrant authorizes law enforcement personnel to compel any individual, who is found at the Subject Premises 4 and reasonably believed by law enforcement to be a user of the device, to provide biometric features, as described in the preceding paragraph, to access or otherwise unlock any device. Further, this warrant does not authorize law enforcement personnel to request that the individual state or otherwise provide the password or any other means that may be used to unlock or access another person's device(s), including by identifying the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the devices.

This warrant authorizes the seizure or any cellular device(s) located in Subject Premises 4 and the forensic examination of cellular device(s) connected to Dominic Romero for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

### Items to be Seized

**Items to be Seized:** All evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 922(g)(1): Felon in possession of a firearm; 18 U.S.C. § 924(C): Possessing a firearm in furtherance of drug trafficking crime; ~~18 U.S.C. § 371 Conspiracy~~; 21 U.S.C. § 841(a)(1): Possession with intent to distribute a controlled substance; 21 U.S.C. § 846: Conspiracy to distribute a controlled substance to include the following: *KK*

1. Firearms, firearm parts, magazines and ammunition;
2. All safes or lock boxes, where evidence of the Target Offenses may be stored for safekeeping against seizure;
3. Controlled substances, drug packaging materials, and paraphernalia;
4. Large amounts of United States Currency and expensive jewelry;
5. ~~Video surveillance hard drives or storage devices~~ *KK*
6. Articles of property tending to establish the identity of persons in control of premises, vehicles, storage areas, and containers being searched, including ~~utility company receipts~~, rent receipts, addressed envelopes, and keys. All documentation, (whether on paper or stored electronically ~~magnetic, digital, or optical media~~) describing discussions by any individual or entity concerning: the identity of persons that are involved in violations of the Target Offenses; *KK*
7. All documents and communications (whether on paper or stored electronically ~~magnetic, digital, or optical media~~) demonstrating any communication or correspondence with any person or groups of persons involved in violations of the Target Offenses; *KK*
8. All evidence related to all off-site storage units, other residences, safety deposit boxes, etc. where evidence of the Target Offenses may be stored for safekeeping against seizure; and
9. Cellular telephones and all cellular telephone records to establish ownership of the device ~~or the residence~~. *KK*